# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**JONATHAN SCHWENDEMAN,**

             **Plaintiff,**

  **v.**

**MARIETTA CITY SCHOOLS,** *et al.,*

        **Defendants.**

**Case No. 2:18-CV-588**
**JUDGE EDMUND A. SARGUS, JR.**
**Magistrate Judge Kimberly A. Jolson**

## OPINION AND ORDER

The instant matter is before this Court for consideration of a joint Motion for Summary Judgment (ECF No. 23) filed by Defendants Marietta City Schools, Will Hampton, and Darrell Primm (collectively, "Defendants"), Plaintiff Jonathan Schwendeman's ("Plaintiff") Brief in Opposition (ECF No. 31), and Defendants' Response to Plaintiff's Brief in Opposition (ECF No. 34). For the reasons that follow, this Court **GRANTS** Defendants' joint Motion for Summary Judgment. (ECF No. 23).

## I.

### A. Factual Background

On June 13, 2018, Plaintiff brought this suit against Defendants alleging: (i) disability discrimination in violation of 42 U.S.C. § 12102; (ii) disability discrimination in violation of R.C. § 4112; (iii) Federal Medical Leave Act ("FMLA") retaliation; (iv) retaliation; and (v) intentional infliction of emotional distress. (ECF No. 1, at 1 & 8-12).

In June of 2001, Plaintiff began working for Defendant Marietta City Schools ("Defendant MCS") as a seasonal maintenance worker. (ECF No. 24-3, Pl.'s Dep. at 29-30). Within a year, Defendant MCS hired Plaintiff as a part-time certified bus driver, and Plaintiff became a full-time

bus driver for Defendant MCS in 2005. (*Id.* at 30-33). Beginning in 2016, Defendant Darrell Prim ("Defendant Prim") served both as Plaintiff's direct supervisor and as the facilities and transportation manager. (ECF No. 24-1, Def. Prim Dep. at 14-15). Defendant Will Hampton ("Defendant Hampton") served as Defendant MCS' superintendent starting in 2015 and continuing through Plaintiff's termination, which occurred in May of 2017. (ECF No. 24-2, Def. Hampton Dep. at 16; ECF No. 29-1, Def. Hampton Dep. Ex. 22).

Plaintiff worked primarily as a full-time bus driver from 2005 until his termination in 2017, though he also worked as a noon duty supervisor for Defendant MCS during that time. (*Id.* at 32-33; ECF No. 29-1, Def. Hampton Dep. Ex. 1). As a full-time bus driver, Plaintiff was responsible for transporting students in a safe and efficient manner from designated pickup points to and from school. (ECF No. 29-1, Def. Hampton Dep. Ex. 1). As a noon duty supervisor, Plaintiff spent a few hours each day supervising "students in study hall, cafeteria, halls and the ground surrounding the schools facility." (*Id.*).

Plaintiff's employment as a full-time bus driver joined him to a collective bargaining agreement between the Ohio Association of Public-School Employees ("OAPSE") and Defendant MCS (the "CBA"). (*See generally* ECF No. 29-2, Def. Hampton Dep. Ex. 2). The CBA outlines the procedures for: filing a grievance—Article 7, discipline and discharge—Article 8, sick leave and personal days—Article 10, and general provisions for bus drivers—Article 15. (*Id.*). The grievance procedure in Article 7 allows employees to address issues informally and, if needed, escalate their concerns to a formal grievance through four optional steps beginning with writing a complaint and ending with arbitration. (*Id.* at 3-4).

Article 8 covers the process by which an employee may be disciplined for just cause. (*Id.* at 8). The procedure provides that the Board of Education will hold an informal conference for the

first offense and a formal hearing for the second. (*Id.* at 9). If the allegations against the employee are supported, then the Board of Education is authorized to proceed with disciplinary action in the form of written reprimand, suspension without pay, or termination. (*Id*). Further, an employee may be subject to immediate suspension prior to a hearing for theft of Board property or falsification of any records. (*Id.*). The CBA states no discipline will be imposed beyond "the thirtieth (30th) calendar day after the employee's supervisor becomes aware of the occurrence of the alleged event which gives rise to the proposed discipline except where the matter is under investigation by Children Services or law enforcement or other good cause, including disciplinary action required by law." (*Id.*).

The protocol for requesting sick leave and personal leave is found in Article 10 of the CBA. (*Id.* at 6). According to Article 10, each employee is entitled to fifteen days of sick leave which can be used for personal illness or injury. (*Id.*). Specifically, the CBA states that a "Doctor's excuse may be required by management after an employee has used three (3) consecutive or fifteen (15) sick days in a school year." (*Id.*). The CBA also states that "all non-teaching employees are eligible for a maximum of four (4) school calendar days with pay for personal leave." (*Id.* at 7). Moreover, the CBA does not restrict an employee's activities during personal leave. (*Id.* at 6-8).

In August of 2016, Plaintiff had surgery to correct a long-term foot injury. (Pl.'s Dep. at 34). According to Plaintiff, the initial injury occurred in 2001 when he dropped a heavy device on his foot. (*Id.*). The pain from that injury lingered for several years before it progressed to the point of requiring surgery. (Pl.'s Dep. 34-35). Dr. Hebb performed the surgery on August 10, 2016. (*Id.* at 36; ECF No. 29-3, Def. Hampton Dep. Ex. 3). After the surgery, Plaintiff wore a hard cast over his foot, and his walking was impaired for approximately three weeks. (Pl.'s Dep. at 117).

Following the surgery, Plaintiff requested sick leave on August 24, 2016 to complete his convalescence. (*Id.* at 46-48).

Prior to his request, on August 22, 2019, Plaintiff gave Defendant Prim medical documentation authored by Dr. Hebb which explained that Plaintiff should not return to work with Defendant MCS until October 17, 2016. (Pl.'s Dep. at 44-45; ECF No. 29-3, Def. Hampton Dep. Ex. 3). Although Dr. Hebb originally authorized Plaintiff to return on October 17, 2016, Plaintiff injured himself again during his sick leave which caused Dr. Hebb to extend Plaintiff's return date to October 24, 2016. (*Id.*).

Plaintiff then took sick leave from August 24, 2016 to October 24, 2016. (Pl.'s Dep. at 50). Plaintiff also took two personal days on October 25th and October 26th of 2016 for matters unrelated to his foot injury before ultimately returning to work on October 27, 2016. (*Id.* at 48-49).

On October 28, 2016, Plaintiff was notified that Defendant Prim and Defendant Hampton planned to meet with him to discuss his sick leave. (Pl.'s Dep. at 84-85). Defendant Hampton called for this meeting after Defendant Prim informed him that a fellow employee's wife saw Plaintiff walking around Peddler's Junction in a Belpre Police Department ("Belpre PD") uniform during his sick leave. (ECF No. 29-8, Def. Hampton Dep. Ex. 10 at 2; ECF No. 29-20, Def. Prim Dep. Ex. B at 1-2). Defendant Prim followed up on that tip with the Belpre PD Chief of Police who explained that Plaintiff was a volunteer not an employee, and that Plaintiff worked as a patrolman through a subcontractor with Shelly and Sands, Inc. a local company. (ECF No. 29-20, Def. Prim Dep. Ex. B at 2). Accordingly, Defendant Hampton, Defendant Prim, and Plaintiff met on November 3, 2016 to discuss Plaintiff's work with Belpre PD and Shelly & Sands, Inc.. (ECF No. 29-8, Def. Hampton Dep. Ex. 10 at 2).

In that meeting, Defendant Hampton and Defendant Prim told Plaintiff what they had discovered. (*Id.*). Plaintiff responded that he occasionally volunteers for Belpre PD and that he has also worked as a patrolman on traffic detail for Shelly and Sands, Inc.. (*Id.*). Plaintiff further explained that traffic detail requires him to go out in a cruiser and work alongside road crews. (*Id.*). Specifically, Plaintiff would sit in a patrol car with his lights on, and, occasionally, he would get out of his vehicle to direct traffic on a highway or road. (*Id.*). Plaintiff confirmed that he was paid $ 41.50 per hour for that work. (*Id.*). Plaintiff also stated that he was not paid by Belpre PD; instead, Plaintiff confirmed that he is an independent contractor for Shelly and Sands, Inc. and that they pay him for his work as a patrolman. (*Id.*).

While Plaintiff disclosed the nature of his work with Belpre PD and Shelly and Sand, Inc., he did not initially provide Defendants with an exact timeline for that work. (*Id.* at 2-3). Defendants Hampton and Prim questioned Plaintiff to ascertain that information. (*Id.*). But Plaintiff could not confirm every date and time that he worked during sick leave. (*Id.*). Plaintiff confirmed only that he worked for Shelley and Sand, Inc. on September 29 and 30 of 2016 as well as October 15 and 16 of 2016. (*Id.*). After the meeting, Defendants Hampton and Prim initiated an investigation into Plaintiff to verify the dates that he had given them. (*Id.* at 3). Consequently, Defendant Hampton contacted Belpre PD to confirm the details of Plaintiff's work for them. (*Id.*). Belpre PD verified that Plaintiff was a volunteer; but they had no records for Plaintiff's work with the "road crew" since that work was done as an independent contractor through Shelly and Sands, Inc.. (*Id.*). Accordingly, Defendant Hampton contacted Shelley and Sands, Inc.'s payroll department and they confirmed Plaintiff's employment but refused to release specific details such as dates and times. (*Id.* at 3-4).

By the time of the November 3, 2016 meeting, Defendants Prim and Hampton knew Plaintiff had both volunteered for Belpre PD and worked for Shelley and Sand, Inc. as an independent contractor, but they did not discipline Plaintiff. (Def. Hampton Dep. at 74-75). According to Defendant Hampton, he did not have enough evidence to discipline Plaintiff:

> Q.· ·So it's your testimony that you could not take any action, disciplinary or otherwise, without conformation of pay?
> A.· ·No. Confirmation of facts.
> Q.· ·Okay. Aside from just what Mr. Schwendeman was telling you?
> A.· ·He was telling us all kinds of things and then changing them as we go.
> Q.· ·If we look at paragraph 7 of your affidavit, sir... It says, "He said that he knows he worked on September 29th and 30th, 2016 and October 15th and 16th of 2016."· Do you see that?
> A.· ·Yes.
> Q.· All right, sir. So in his meeting with you in November, Mr. Schwendeman told you he was working for Shelly & Sands and he gave you four different dates that he was working, correct?
> A.· ·Yes, and he backtracked from that and said that he wasn't sure.

(*Id.*).

On November 15, 2016, a second meeting was held between Plaintiff, Defendant Hampton, Defendant Prim, Courtney Kleintop—the OAPSE president, and Liz Walls—an OAPSE Regional Representative. (Pl.'s Dep. at 91-92; ECF No. 29-8, Def. Hampton Dep. Ex. 10 at 4). The objective of the second meeting was the same as the first, to inquire into Plaintiff's sick leave. (*Id.*). According to Plaintiff, the participants in the meeting wanted him to clarify the dates that he had worked during his sick leave. (*Id.*). But Plaintiff never answered questions directly because OAPSE Regional Representative Liz Walls spoke on his behalf.

> Q. Tell me what was discussed at that meeting.
> A. Basically what was said at the first meeting, you know, that they had word that I was seen down at Belpre working or volunteering. They wanted to know more information as to what dates, times.
> Q. And what was your response to that?
> A. I really did not do any of the answering. It was actually my field rep that did the talking for the most part.
> Q. And what did your field rep say?

A. In a roundabout way, that they were doing the investigation, that they need to look for the information themselves.

(Pl.'s Dep. at 91-92). After the meeting, the investigation remained open until February 6, 2017. (Def. Hampton Dep. at 49). During that time, Plaintiff was not disciplined, and he continued to work for Defendant MCS. (*Id.*).

On February 6, 2017, Plaintiff emailed Defendant Hampton to inquire into the status of his investigation, believing it was still ongoing. (*See generally* ECF No. 29-4, Def. Hampton Dep. Ex. 4). Defendant Hampton, referencing the November 15, 2016 meeting, responded and wrote:

> [i]n our meeting we shared information and discussed whether or not you were working fro [sic] someone else while you were on sick leave from MCS. When we concluded the meeting we were finished. No findings were made so no discipline was issued. At this time, the matter is closed unless new information is presented.

(*Id.*). Plaintiff disagreed with Defendant Hampton, and he wrote back that the investigation appeared to be ongoing since Defendant Hampton had reached out to Belpre PD on November 18, 2016. (*Id.*). Defendant Hampton replied and stated: "I have nothing new to report and am not currently pursuing or investigating anything regarding the matter." (*Id.*). According to Defendant Hampton, the investigation ended February 6, 2017 because they could not confirm whether Plaintiff was paid by Belpre PD or Shelley and Sand, Inc., or the exact dates that Plaintiff worked. (Def. Hampton Dep. at 49).

Shortly after this email exchange, on February 14, 2017, Plaintiff filed Charges of Discrimination against Defendants with the Equal Employment Opportunity Commission ("EEOC") and the Ohio Civil Rights Commission ("OCRC") (collectively, the "Discrimination Charges"). (*See generally* ECF No. 29-5, Def. Hampton Dep. Ex. 5). In the Discrimination Charges, Plaintiff stated:

III. I believe that I was discriminated on the basis of my disability, because:

A. From October 28, 2016 through November 16, 2016, Respondent questioned the medical notes submitted by my physician, stating that I could have returned to work and performed my job duties at an earlier date.
B. From October 28, 2016 through November 16, 2016, Respondent repeatedly contacted Belpre Police Department and Shelly and Sand Corp. questioning my working schedule with the Department.
C. When I asked Hampton about the outcome of my investigation on November 16, 2016, Hampton responded that investigation [sic] is complete until new information would be discovered. I have evidence to believe that Respondent contacted Belpre Police Department and Shelly and Sand Inc. on November 18, 2016.
D. From August 24, 2016 through October 27, 2016, I was on disability leave as supported by medical documentation.

(*Id.*). After Plaintiff submitted his Discrimination Charges, the EEOC conducted its own investigation and denied them. (Pl.'s Dep. at 94-97). Dissatisfied, Plaintiff appealed the denials, but his appeals were denied as well. (*Id.*).

According to Defendant Hampton, he became aware of the Discrimination Charges shortly after they were filed, and Defendants reopened their investigation into Plaintiff to respond to the allegations therein. (Def. Hampton Dep. at 51-52). Thereafter, but sometime prior to April 7, 2017, Plaintiff reported to Defendant Hampton that he was followed by a Defendant MCS vehicle driven by two Defendant MCS employees—James Buaman and Rick Dennis. (Def. Hampton Dep. at 128-130). It was also discovered that Rick Dennis requested and was given Plaintiff's personnel file on April 5, 2017. (*Id.* at 131-132).

After Plaintiff's initial report, Defendant Hampton went to Defendant Prim and relayed what Plaintiff had told him. (*Id.*). Defendant Prim confronted James Bauman and Rick Dennis, both of whom reported to Defendant Prim. (Def. Hampton Dep. at 128-129; Def. Prim Dep. at 40-41). Both individuals admitted to following Plaintiff, and Defendant Prim instructed them to stop. (ECF No. 29-16, Def. Hampton Dep. Ex. 24; Def. Prim Dep. at 40-41). However, neither individual was disciplined, and neither individual explained why they followed Plaintiff. (Def. Prim Dep. at 40-41).

On April 7, 2017, Plaintiff followed up with Defendant Hampton via email. (ECF No. 29-16, Def. Hampton Dep. Ex. 24). In the email, Plaintiff reiterated much of what he and Defendant Hampton had already discussed, and he requested further investigation into his concerns. Specifically, Plaintiff stated:

> I Jonathan Schwendeman called you on April 4, 2017 in regards to being followed up by a maintenance vehicle belonging to the Marietta city school board and occupants of that vehicle would or could have been Rick Dennis and or Jimmy Bauman during this time I asked that this be investigated and that the situation come to an end immediately. At which time you asked that I put it in writing, you also stated that you were not aware of the situation. I would like to know what type of investigation took place actions that were taken and statements that pertain to this investigation fax and find furthermore the disposition of this investigation.

(*Id.*). That same day, Defendant Hampton emailed Plaintiff back and informed him that "the matter was addressed by Mr. Prim," "[n]either individual disputed the claim" and that "[i]t was [his] expectation that this will not happen again." (*Id.*).

Thereafter, a representative for Defendant MCS contacted Belpre PD and Shelly and Sands, Inc in furtherance of the investigation into Plaintiff's sick leave. (Def. Hampton Dep. at 55-57). On April 10, 2017, Defendant Hampton received records from Belpre PD indicating that Plaintiff had volunteered for six separate days for four hours a day during his sick leave. (*Id.* at 57; ECF No. 29-6, Def. Hampton Dep. Ex. 7). According to Defendant Hampton, the inconsistencies between the records and the statements that Plaintiff gave during the November meetings was surprising:

> Q.· ·Okay.· And do you know what part of what Mr. Schwendeman had told you was dishonest?
> A.· ·The extent that he was volunteering or working for the Belpre Police Department.
> Q.· ·Okay.· He --
> A.· ·I remember being surprised at the number of days.
> Q.· ·Okay.· He didn't tell you that he had worked six days?
> A.· ·No.

(Def. Hampton Dep. at 59). On April 20, 2017, Defendant Hampton emailed Plaintiff and ordered him to attend a meeting to "discuss matters related to [his] sick leave." (ECF No. 29-11, Def. Hampton Dep. Ex. 15 at 1).

Prior to the meeting, Defendants sent Plaintiff a Notice of Suspension and a Notice of Proposed Discharge (collectively, the "Notices"). (ECF No.s 29-13 & 29-14, Def. Hampton Dep. Ex.s 20-21). The Notices immediately suspended Plaintiff, and they also informed him that he was being recommended for discharge for working with Belpre PD and Shelly and Sands, Inc. during his sick leave. (*Id.*). According to the Notices, Plaintiff had committed two criminal offenses through his conduct: (i) "falsification for the purpose of obtaining governmental benefits" in violation of O.R.C. § 2921.13; and (ii) "falsification of an application for sick leave from public school employment" in violation of O.R.C. § 3319.141. (*Id.*). The Notices also stated that Plaintiff was being disciplined for "dishonesty in response to questions from schools officials concerning [his] activities while on sick leave from the District." (*Id.*).

On April 27, 2016, Defendant Hampton confronted Plaintiff about what he had learned, and he gave Plaintiff an opportunity to explain himself. (Def. Hampton Dep. at 109-110). After their conversation, Defendant Hampton recommended Plaintiff's termination to Defendant MCS' Board of Education. (*Id.* at 109). Thereafter, Defendants filed a police report on May 2, 2017 with the Marietta Police Department ("Marietta PD") accusing Plaintiff of theft. (*See* ECF No. 29-17, Def. Hampton Dep. Ex. 25 at 3-4). To corroborate Defendant Hampton's accusation, members of the Marietta PD subpoenaed Shelly and Sands, Inc. and sent two requests for records to Belpre PD. (*Id.* at 6).

The investigating officer made several findings in his report. (*See generally* ECF No. 29-17, Def. Hampton Dep. Ex. 25). First, "Hampton brought it to my attention that there had been

what they believed to be a theft that occurred and it involved one of their employees. Hampton was first made aware of this back in November or December of 2016." (*Id.* at 4). Second, Plaintiff worked for Belpre PD in its unpaid reserve unit for four hours on each of the following days: "October 7, 2017 [sic], October 8, 2016, October 21, 2016, October 25, 2016, October 26, 2016, and October 28, 2016." (*Id.* at 4-5). Third, Plaintiff worked for Shelly and Sands, Inc. on September 29 and 30 of 2016 for three hours each day, and he was paid $246.00 for that work. (*Id.* at 9). Fourth, Plaintiff worked for Shelly and Sands, Inc. on October 25, 2016 for six hours and on October 26, 2016 for eight-and-a-half hours, and he was paid a total of $594.50 for that work. (*Id.*). At the conclusion of the police report, the investigating officer noted that he would send the file to the county prosecutor for review and presentation to a grand jury. (*Id.* at 11).

In the meantime, on May 8, 2017, Defendant MCS held a special meeting and voted to terminate Plaintiff's employment. (ECF No. 29-15, Def. Hampton Dep. Ex. 22). The next day, on May 9, 2017, Plaintiff received an email from Defendant MCS officially terminating his employment. (*Id.*). Defendant Hampton explained during deposition that Defendant MCS terminated Plaintiff for falsifying sick leave. (ECF No. 24-2 at 21-22). When asked to clarify what falsification of leave meant, Defendant Hampton answered, "[b]eing on leave when you're capable of working, being on leave for reasons other than you've given." (*Id.*). A few weeks later, on May 22, 2017, Plaintiff filed Charges of Retaliation against Defendants with the EEOC and OCRC (the "Retaliation Charges") both of which stated:

> III. I believe that I was discriminated on the basis of retaliation, because:
> A. On February 6, 2017, Respondent's Superintendent, Will Hampton, told me that Respondent completed and closed the investigation of my alleged misconduct as described in my previous charge affidavit filed with the Commission (COL 71 (44968) 02152016).
> B. In early April, 2017, after Hampton learned of the my [sic] discrimination complaint filed with the Commission, he opened another investigation and made a public record request once again.

C. On April 24, 2017, after Hampton opened a new investigation, Respondent recommended to the Marietta City School Board of Education to terminate my employment for, among other issues, accepting work during full sick leave pay.

D. On April 24, 2017, Respondent asked me on two occasions whether I would like to voluntarily resign my employment with Respondent. After I refused to resign voluntarily, Respondent suspended my employment without pay.

(*See generally* ECF No. 29-5, Def. Hampton Dep. Ex. 5). After Plaintiff submitted the Retaliation Charges, the EEOC conducted an investigation and denied them. (Pl.'s Dep. at 94-97). Plaintiff appealed the denials, but his appeals were denied. (*Id.*).

On May 24, 2017, pursuant to Article 7 of the CBA, Plaintiff filed a grievance against Defendant MCS objecting both to his termination and the allegations made against him in the Notices. (ECF No. 29-9, Def. Hampton Dep. Ex. 11 at 14-16). Specifically, Plaintiff argued in his grievance that there was no just cause for his termination because his discipline was not timely, his other jobs did not conflict with his obligations to Defendant MCS, and there was no theft. (*Id.*). But according to Plaintiff, he voluntarily withdrew the grievance "due to getting—seeking legal help." (Pl.'s Dep. at 41 & 103-104). Defendant MCS upheld Plaintiff's termination following the withdrawal of his grievance. (Def. Hampton Dep. at 127-128).

In July of 2018, the theft charges alleged against Plaintiff in the police report were finally presented to a grand jury. (ECF No. 29-18, Def. Hampton Dep. Ex. 26). Specifically, the prosecutor sought an indictment "for either Grand Theft or Theft in the Office." (*Id.*). But the grand jury withheld indictment on both charges. (*Id.*). The prosecuting attorney noted:

I believe that the reason for their decision was this: [T]he validity of the doctor's excuse that he provided was unquestioned. Everyone accepted that he did undergo a surgical procedure in August, 2016, and his doctor had not cleared him to return to work until the latter part of October, 2016. Furthermore, it seemed clear that he had accumulated sufficient sick time credit to be off work from late August to late October, 2016. In light of this, the grand jurors weren't all that impressed with the fact that he was able to do something else, either with compensated or as a volunteer, during the time that he was off on medical leave. At the end of the session, one person commented that, if Schwendeman had simply stayed at home the entire time and played video games, there would have been no case at all against

him. So why, he wondered, should we punish someone for trying to get out of the house and do something, as opposed to just sitting home wasting time?

I think it was also important that school employees did not have to certify that they were physical (sic) unable to work during the time they were using sick leave. As you testified – police officers must affirmatively state that they are unable to work when they take sick leave. At least in the fall of 2016, school employees apparently did not have to make such a statement.

In summation, I believe that the fact that he had a valid doctor's excuse, and the fact that he had sufficient sick leave accumulated to cover the days of work that he missed, were sufficient for the grand jury to concluded that he had not committed a theft offense. They seemed to view the fact that he worked or volunteered his time with some other agencies while drawing sick leave pay to be an issue between Schwendeman and those agencies, but not an issue for the Marietta City Schools.

(*Id.*).

Plaintiff initiated the instant suit following these events.

## II.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248, *see*

*also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## III.

Plaintiff alleges Defendants discriminated against his disability in violation of 42 U.S.C. § 12102 and O.R.C. § 4112, and also brings claims for retaliation, FMLA retaliation, and intentional infliction of emotional distress. (ECF No. 1, at 1 & 8-12). Defendants move for summary judgment on all of Plaintiff's claims. (*See generally* ECF No. 23). Specifically, Defendants contend that they are entitled to summary judgment for the following reasons: (i) Plaintiff's discrimination claim is defective on its face and he cannot establish that falsification of sick leave was a pretext for discrimination in violation of 42 U.S.C. § 12102; (ii) Plaintiff cannot establish that falsification of sick leave was a pretext for discrimination in violation of O.R.C. § 4112.02; (iii) Plaintiff's FMLA retaliation claim fails since there is no evidence that any adverse employment action was based on his use of FMLA leave; (iv) Plaintiff's retaliation claim fails since there is no evidence that Defendants' reason for terminating Plaintiff were pretextual; and (v) there is no evidence that Defendants' conduct was outrageous. (ECF No. 23 at 13, 16, 18, 20 & 22). The Court will address each of these arguments in turn.

### A. Disability Discrimination Under the ADA and Ohio Law

Turning first to Plaintiff's claims for disability discrimination under the ADA and Ohio law. Congress enacted the ADA in 1990, in part, to prohibit public entities from discriminating against qualified individuals with disabilities. 164 A.L.R. Fed. 433 § 2(a). The statute also specifically prohibits public employers from "excluding such an individual from participation in, or denying the individual the benefits of, any of the entity's services, programs, or activities." 164

A.L.R. Fed. 433. "Historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." *Olmstead v. L.C. ex. Rel. Zimring*, 527 U.S. 581, 600 (1999) (quoting 42 U.S.C. § 12101(a)(5)).

To establish a *prima facie* case of disability discrimination under the ADA, a plaintiff must prove that:

> (1) he or she is disabled; (2) otherwise qualified for the position, with or without reasonable accommodation; (3) suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. The defendant must then offer a legitimate explanation for its action. If the defendant satisfies this burden of production, the plaintiff must introduce evidence showing that the proffered explanation is pretextual. Under this scheme, the plaintiff retains the ultimate burden of persuasion at all times.

*Monette v. Electronic Data System Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996); *see also Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011) (adopting the five-part test presented in *Monette*); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–806 (1973) (providing the burden-shifting framework). According to the Sixth Circuit, "[p]roof of these five facts, in the absence of an explanation by the employer, creates a mandatory inference that the employer intentionally discriminated against the disabled individual." *Monette*, 90 F.3d at 1186.

"Once a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason' for its actions." *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008) (quoting *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001)). "If the defendant can satisfy its burden, the plaintiff must show by a preponderance of the evidence that the proffered explanation is a pretext for discrimination." *Id.*

As previously noted by this Court, "Ohio disability discrimination law generally applies the same analysis as the ADA." *Johnson v. JPMorgan Chase & Co.*, 922 F. Supp. 2d 658, 674 n.6 (S.D. Ohio 2013) (citing *Jakubowski v. Christ Hospital, Inc.*, 627 F.3d 195, 201 (6th Cir. 2010)). In fact, Ohio courts "look to regulations and cases interpreting the [ADA] for guidance in [their] interpretation of Ohio law." *Johnson*, 922 F. Supp. 2d at 674 n.6 (quoting *City of Columbus Civil Service Commission v. McGlone*, 82 Ohio St. 3d 569, 573 (1998)). Both parties analyze Plaintiff's disability discrimination claims under the ADA. Accordingly, this Court will analyze Plaintiff's ADA and Ohio disability discrimination claims together.

Defendants maintain that Plaintiff's ADA claims are flawed for various reasons. (ECF No. 23 at 13-18). First, Defendants argue that Plaintiff's disability discrimination claim is flawed on its face because Plaintiff was not prevented from taking sick leave. (*Id.* at 14) Second, Defendants argue that, aside from Plaintiff's Complaint, there is no evidence that Defendants' interfered with Plaintiff's sick leave in any way. (*Id.*). Third, Defendants aver that Plaintiff cannot establish a *prima facie* case because he was not disabled. (*Id.*). Fourth, Defendants' argue that Plaintiff cannot overcome the legitimate non-discriminatory reason that they have offered for his termination. (*Id.* at 15). Plaintiff counters Defendants' position arguing that he was disabled, he has established a *prima facie* case of discrimination, and that Defendants' reason for his termination is pretextual. (ECF No. 31 at 15-20).

## 1. Interference with ADA Privileges

Defendants direct this Court's attention to the fact that Plaintiff was given sick leave from August 24, 2016 to October 24, 2016. (*Id.*). Plaintiff does not dispute that fact. (*See generally* ECF No. 31). But the plain language of the ADA states that, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the

hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

As a fundamental matter, Plaintiff alleges in his Complaint that he was prevented from taking sick leave, but this Court agrees with Defendants that this allegation finds no support in the record. (*Compare* ECF No. 1, at 8-9 *with* Pl.'s Dep. at 50).

## 2. *Prima Facie* Case of Disability Discrimination

Turning next to whether Plaintiff established a *prima facie* case of disability discrimination, Plaintiff has the initial burden to show: (1) he is disabled, (2) but otherwise qualified for the position with or without reasonable accommodation, (3) he suffered an adverse employment decision, (4) Defendants knew or had reason to know of Plaintiff's disability, and (5) either the position remained open, he was replaced by a non-disabled person, or a similarly-situated non-disabled employee was treated more favorably. *Whitfield v. Tennessee*, 639 F.3d at 259. The parties do not dispute the last four elements; their dispute turns only on the first—whether Plaintiff was disabled. (ECF No. 23 at 14-15; ECF No. 31 at 15).

Defendants argue that there is no evidence in the record to suggest Plaintiff is an individual with a disability since he took sick leave and fully returned to work on October 24, 2016. (ECF No. 23 at 14). But Plaintiff maintains that Defendants' argument must fail since his injury fits under the definition of disability found in the ADA. (ECF No. 31 at 16). This Court agrees.

The ADA provides rules of construction for various terms such as "disability" and it states that "[t]he definition of disability" under the ADA "shall be construed in favor of broad coverage." 42 U.S.C. § 12102(4)(A). "That is because the primary concern of the ADA is 'whether covered entities have complied with their obligations and whether discrimination has occurred,' not

17

whether an individual's impairment is a disability." *Hostettler v. College of Wooster*, 895 F.3d 844, 853 (6th Cir. 2018).

The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A). "Courts that have analyzed [the record-of-impairment] prong have held that it includes 'people who have recovered from previously disabling conditions . . .'" *Neely v. Benchmark Family Services*, 2015 WL 1809369, at *8 (S.D. Ohio). The plaintiff "only needs to show that at some point in the past he had [a substantially limiting impairment]." *Knight v. Metro Gov't of Nashville & Davidson Cnty.*, 136 F. App'x 755, 760 (6th Cir. 2005).

Under the ADA, "major life activities" include, but are not limited to: caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. 42 U.S.C. § 12102(2)(A). Courts should not strictly interpret the term "major" to create a demanding standard. *Hostettler*, 895 F.3d at 853. To determine whether a disability substantially limits major life activities, Courts should compare the person claiming a disability to most people in the general population. *Id.*. The impairment does not have to prevent, or significantly or severely restrict a major life activity to be substantially limiting. *Id.* Further, like the term "major life activities," the term "substantially limits" shall be construed broadly in favor of expansive coverage and is not meant to be a demanding standard. *Id.* at 853-854.

Here, the record demonstrates that Plaintiff had surgery to correct a long-term foot injury on August 10, 2016. (Pl.'s Dep. at 36; ECF No. 29-3, Def. Hampton Dep. Ex. 3). Although the surgery was an outpatient procedure, Plaintiff had to wear a hard cast afterwards and his ability to

walk was impaired for three weeks. (Pl.'s Dep. at 117). To facilitate Plaintiff's recovery, Dr. Hebb gave Plaintiff medical documentation requiring Plaintiff to abstain from work until October 17, 2016. (Pl.'s Dep. at 44-45; ECF No. 29-3, Def. Hampton Dep. Ex. 3). That medical documentation was shared with Defendant Prim who was Plaintiff's direct supervisor at the time. (*Id.*). According to Defendant Prim, he saw the medical documentation and sent it to the board office. (Def. Prim Dep. at 17-18).

Considering the above, a reasonable fact-finder could conclude that, at some point in the past, Plaintiff had a physical impairment that substantially limited a major life activity and that there is a record of such impairment. Plaintiff has therefore met his burden of establishing a *prima facie* case of disability discrimination.

### 3. Legitimate Reason for Termination

Defendants argue that even if Plaintiff meets his burden of establishing a *prima facie* case, he was nevertheless dismissed for legitimate reasons such as falsification of leave and falsification of benefits. (ECF No. 23 at 15). Violations of express company policies are legitimate, non-discriminatory reasons for taking adverse employment action. *Holmes v. J.P. Morgan Chase National Corporate Services, Inc.*, No. 09-10642, 2010 U.S. Dist. LEXIS 4124, at *8 (E.D. Mich. Jan. 20, 2010); *Blackshear v. Interstate Brands Corp.*, 495 Fed. App'x 613, 618 (6th Cir. 2012).

Dishonesty is also a legitimate, non-discriminatory reason for terminating an employee. *Kitts v. General Telephone North, Inc.*, No. 2:04-cv-173, 2005 U.S. Dist. LEXIS 20421, at *45 (S.D. Ohio Sep. 19, 2005) (holding that the plaintiff was terminated because she lied about the reason for her absence, not because she took FMLA leave); *Conley v. City of Findlay*, 266 Fed. App'x 400, 405 (6th Cir. 2008).

Here, the CBA sets forth a policy authorizing Defendants to suspend or terminate an employee for "theft of . . . Board property" or "falsification of any records . . . ." (ECF No. 29-2, Def. Hampton Dep. Ex. 2 at 9). The Notices indicate that Plaintiff was discharged for those reasons. (ECF No.s 29-13 & 29-14, Def. Hampton Dep. Ex.s 20-21). The Notices also explained that disciplinary action would be taken against Plaintiff for "dishonesty in responding to questions from schools [sic] officials concerning activities on sick leave." (*Id.*).

Thus, Defendants have articulated a legitimate, non-discriminatory reason for the adverse employment action taken against Plaintiff. Accordingly, the burden shifts to Plaintiff to demonstrate that a reasonable jury could deem Defendants' explanation pretext for discrimination. *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

### 4. Pretext

To prove pretext, a plaintiff must show one of the following: (1) the proffered reasons for the adverse action have no basis in fact, (2) the proffered reasons did not actually motivate the employer's action, or (3) the proffered reasons were insufficient to motivate the employer's action. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012). To demonstrate pretext under the first prong, the plaintiff must establish that the proffered reason for his termination is "factually false." *Barker v. Paccar, Inc. d/b/a Kenworth*, No. 2:18-cv-338, 2019 WL 4040533, at *11 (S.D. Ohio 2019). "This requires showing 'more than a dispute over the facts upon which his charge was based' but also that the employer did not 'honestly believe' in its proffered reason." *Sharp v. Profitt*, 674 Fed. Appx. 440, 446 (6th Cir. 2016) (citing *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-494 (6th Cir. 2001)).

If an employer has an "honest belief" in the nondiscriminatory basis upon which it has made its employment decision (i.e. the adverse action), then the employee will not be able to

establish pretext. *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (stating that "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect"). As the Sixth Circuit has stated, "[w]hen an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'" *Chen*, 580 F.3d at 401 (quoting *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 713-15 (6th Cir. 2007)).

The employer's claim of honest belief is necessarily tied to the nature of its investigation and disciplinary decision process. *Tingle*, 692 F.3d at 531. The "key inquiry . . . is 'whether the employer made a reasonably informed and considered decision before taking' the complained-of action." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598-99 (6th Cir. 2007) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). The employer certainly must point to particularized facts upon which it reasonably relied. *Tingle*, 692 F.3d at 531. But the Sixth Circuit does not "require that the decisional process used by the employer be optimal or that it left no stone unturned." *Smith*, 155 F.3d at 807; *see also Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 398 (6th Cir. 2008).

"To survive a motion for summary judgment, the plaintiff need not *prove* that the defendant's proffered rationale is pretextual, as that would be enough proof for summary judgment in favor of the plaintiff." *Whitfield v. Tennessee*, 639 F.3d at 260. "Rather, the plaintiff must prove only enough to create a genuine issue as to whether the rationale is pretextual." *Id.* "At all times, the plaintiff bears the ultimate burden of persuading the trier of fact that illegal discrimination took place." *Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 883 (6th Cir. 1996).

According to Defendants, they reopened their investigation into Plaintiff to defend against his discrimination allegations, and they confirmed the following as a result: (i) Plaintiff worked with Belpre PD as a reserve officer for several hours on six separate days between October 7, 2016 and October 28, 2016; (ii) Plaintiff was employed with Shelly and Sands, Inc. as a police officer; and (iii) Plaintiff received payment from Shelly and Sands, Inc. during two separate pay periods in September and October of 2016. (ECF No. 34 at 4) (citing ECF No. 34-1, Def. Hampton Dep. Ex. A at 5).

With the above information, Defendants sent the Notices to Plaintiff explaining the grounds for his suspension and subsequent termination. (ECF No.s 29-13 & 29-14, Def. Hampton Dep. Ex.s 20-21). Specifically, the Notices stated that Plaintiff would be disciplined for: working for Belpre PD on at least six (6) separate days in October of 2016; engaging in outside work for Shelly and Sands, Inc., for which he was paid in September and October of 2016; falsely obtaining government benefits in violation of O.R.C. § 2921.13; falsifying an application for sick leave from public school employment in violation of O.R.C. § 3319.141; and dishonesty in responding to questions from schools [sic] officials concerning activities on sick leave. (*Id.*).

The record therefore demonstrates that Defendants reasonably relied on particularized facts in making the decision to terminate Plaintiff. Now the burden shifts back to Plaintiff to produce evidence challenging Defendants' honest belief. *Hardesty*, 758 F. App'x at 493.

### a.  Challenging Defendants' Honest Belief

Plaintiff contends there is sufficient evidence to allow a rational jury to reject Defendants' assertion that they fired him because he falsified sick leave. (ECF No. 31 at 19). Specifically, Plaintiff maintains that he neither misled Defendants nor falsified any documentation concerning his sick leave. (*Id.*). Plaintiff argues, rather, that he underwent surgery, provided Defendants

medical documentation memorializing both his surgery and his need for sick leave, and that his sick leave was authorized. (*Id.* at 19-20). Additionally, Plaintiff argues that his work with Belpre PD and Shelly and Sands, Inc. should not, as Defendants argue, give rise to the assumption that he could perform his regular duties as a bus driver and noon duty supervisor. (*Id.*). Plaintiff further argues that there is no significant difference between what Defendants knew in November of 2016 and what they knew at the time of his termination, since Plaintiff disclosed his work with Belpre PD and Shelly and Sands, Inc. in November of 2016. (*Id.* at 20). This Court disagrees.

In *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, (1993), the Supreme Court stated that "a reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." As the Sixth Circuit has explained, "[i]f an employer has an 'honest belief in the nondiscriminatory basis upon which it has made its employment decision (*i.e.* the adverse action), then the employee will not be able to establish pretext." *Majewski v. Automatic Data Processing, Inc.* 274 F.3d at 1117. A defendant employer is entitled to summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless. *Clay v. United Parcel Serv., Inc.*, 501 F.3d at 713-15.

Viewing the circumstances outlined above, and in a light most favorable to Plaintiff, this Court finds that a jury could not reasonably doubt Defendants' proffered nondiscriminatory explanation that Plaintiff was terminated for falsifying sick leave. This is so because there is no genuine issue of material fact that Defendants terminated Plaintiff believing that Plaintiff was dishonest and had worked during his sick leave. (ECF No.s 29-13 & 29-14). That behavior led Defendants to the conclusion that Plaintiff had falsified his sick leave. (*Id.*; *see* ECF No. 24-2 at 21-22; *see also* ECF No. 29-2 at 8-9).

Plaintiff's argument that he neither misled Defendants nor falsified any documentation concerning his sick leave attempts to undermine Defendants' honest belief that Plaintiff had misused or lied about sick leave. But even if Defendants were mistaken in believing that Plaintiff had misled them or falsified documentation, such a mistake is not a sufficient reason to doubt Defendants' honest belief. *Clay v. United Parcel Serv., Inc.*, 501 F.3d at 713-15 (noting that a defendant employer is entitled to summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless). Further, Defendants maintain that they terminated Plaintiff both for dishonesty and for working during his sick leave. (*see* ECF No. 23 at 15; *see also* ECF No.s 29-13 & 29-14; *see also* ECF No. 24-2 at 21-22). Where the employer asserts more than one reason for the adverse employment decision, the plaintiff must prove that each reason is pretextual. *Philbrick v. Holder*, 583 Fed. Appx. 478, 490 (6th Cir. 2014) (citing *Smith v. Chrysler Corp.*, 155 F.3d at 805-806).

Plaintiff has not met his burden of proving that each of the reasons offered for his termination is pretextual because he offered no evidence to overcome Defendants' honest belief that he falsified sick leave by working two jobs. Plaintiff argues that Defendants improperly assumed he could perform his regular duties because he worked during his sick leave, but, again, such an assumption, even if mistakenly made, is insufficient to cast doubt on Defendants' honest belief. *Clay v. United Parcel Serv., Inc.*, 501 F.3d at 713-715.

Further, to the extent Plaintiff contends he has met his burden by arguing that there is no significant difference between what Defendants knew in November of 2016 and what they knew at the time of his termination, that challenge is also unavailing. The record demonstrates that Plaintiff made fragmented statements during the November 3, 2016 meeting some of which were inconsistent with the employment records that Defendants received the following year. (*Compare*

ECF No. 29-6, Def. Hampton Dep. Ex. 7 *with* ECF No. 29-8, Def. Hampton Dep. Ex. 10 at 2-3).

Those records verified that Plaintiff had worked more hours and more days than he had originally

disclosed. (ECF No. 29-6, Def. Hampton Dep. Ex. 7). That being said, Defendant Hampton stated

that Plaintiff was not terminated after the November 2016 meetings specifically because

Defendants did not have enough evidence to substantiate what Plaintiff had told them, not because

Defendants acquiesced to Plaintiff's conduct. (Def. Hampton Dep. at 74-75). It was only after

Defendants acquired Plaintiff's employment records that they proceeded to suspend and terminate

him. (ECF No. 29-6, Def. Hampton Dep. Ex. 7; Def. Hampton Dep. at 59; ECF No. 29-11, Def.

Hampton Dep. Ex. 15 at 1). As such, this Court is not persuaded that Plaintiff has met his burden

because there is a clear distinction between what the Defendants' knew at the time of the November

2016 meetings and what they knew at the time of Plaintiff's termination.

Notwithstanding the above, Plaintiff has also failed to challenge Defendants' honest belief

because he has not directed this Court's attention to any evidence that would establish

discrimination as the real reason for his termination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. at

515. As Plaintiff acknowledged during deposition, the process for taking sick leave was quick and

informal. (Pl.'s Dep. at 44-45 & 50; ECF No. 29-3, Def. Hampton Dep. Ex. 3). Plaintiff requested

sick leave on August 22, 2016, and he started his sick leave with no interference two days later on

August 24, 2016. (*Id.*). There is no evidence that Defendants discriminated against Plaintiff on the

basis of his disability prior to or during his sick leave. Furthermore, the record demonstrates that

Defendants did not begin their investigation into Plaintiff's sick leave until it had already been

reported that Plaintiff was spotted in a Belpre PD uniform patrolling Peddler's Junction. (ECF No.

29-8, Def. Hampton Dep. Ex. 10 at 2; ECF No. 29-20, Def. Prim Dep. Ex. B at 1-2). Even after

Defendants began investigating Plaintiff, Defendants met with and questioned Plaintiff mainly to

ascertain information about his work with Belpre PD and Shelly and Sands, Inc.. (Pl.'s Dep. at 91-92; Def. Hampton Dep. at 109-110; ECF No. 29-8, Def. Hampton Dep. Ex. 10 at 2 & 4). Aside from questioning Plaintiff directly, Defendants also contacted Belpre PD and Shelly and Sands, Inc., but the record reveals that those contacts were made to gather information on Plaintiff's work with both entities. (Def. Hampton Dep. at 55-57; ECF No. 29-20, Def. Prim Dep. Ex. B at 2; ECF No. 29-8, Def. Hampton Dep. Ex. 10 at 3). The circumstances outlined above do not demonstrate that discrimination was the real reason for Plaintiff's termination. Instead, the circumstances establish Defendants' honest belief that Plaintiff falsified sick leave by working two jobs.

Finally, Plaintiff argues that Defendants' investigation into his sick leave following the Discrimination Charges somehow demonstrates that discrimination was the driving force behind his termination. This challenge is also unavailing. The record establishes that Plaintiff made several allegations against Defendants in the Discrimination Charges, many of which were germane to Defendants' initial investigation. (*See generally* ECF No. 29-5, Def. Hampton Dep. Ex. 5). The record further demonstrates that Defendants reopened their investigation against Plaintiff to respond to those allegations, not as a response to the filing of the Discrimination Charges generally. (ECF No. 24-2 at 52). Initiating an investigation in response to an EEOC charge is commonplace. *See Abbott v. Crown Motor Co.,* 348 F.3d 537, 543 (6th Cir. 2003); *see generally Martin v. Huron Valley Ambulance, Inc.,* 226 F. Supp. 3d 871 (E.D. Mich. 2016); *see also Grimes v. Southwest Airlines Co.,* No. 3:16-2276, 2018 U.S. Dist. LEXIS 15806, at *24 (M.D. Tenn. 2018) (noting that a reasonable jury could not find that the plaintiff was the victim of intentional age discrimination even though the defendant expended an exorbitant amount of time and money investigating and responding to the plaintiff's EEOC charge). And the EEOC, as part of its own investigation into charges of discrimination, can request position statements from a respondent

which, according to the EEOC, should include at minimum a "specific, factual response to every allegation of a charge." U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION: EFFECTIVE POSITION STATEMENTS, https://www.eeoc.gov/employers/position_statements.cfm (last visited Jan. 28, 2020).

In light of the above, this Court is not persuaded that Defendants' investigation into Plaintiff's sick leave was improper simply because the investigation was reopened in response to the allegations contained in the Discrimination Charges. If Plaintiff's argument were accepted, it is difficult to discern what avenues, if any, a respondent employer would have to adequately respond to the allegations contained in an EEOC charge.

For these reasons, Plaintiff has not demonstrated that the Defendants lacked an honest belief in their reasons for terminating him. A reasonable juror, therefore, could not find in Plaintiff's favor. Thus, summary judgment in Defendants' favor on Plaintiff's ADA and Ohio law discrimination claims is appropriate.

## B. FMLA Retaliation Claims

Plaintiff alleges that Defendants violated his rights under the FMLA by retaliating against him for taking FMLA medical leave. (ECF No. 1 at 10-11). Defendants move for summary judgment on this claim arguing there is no evidence that Plaintiff ever took FMLA medical leave. (ECF No. 23 at 19). This Court agrees.

The FMLA "entitles qualifying employees to up to twelve weeks of unpaid leave each year if, among other things, an employee has a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (citing 29 U.S.C. § 2612(a)(1)(D)). There are two theories of recovery under the FMLA statute: (1) the retaliation or discrimination theory arising from § 2615(a)(2), and

(2) the interference theory arising from § 2615(a)(1). *Hunter v. Valley View Local Schools*, 579

F.3d 688, 691 (6th Cir. 2009) (citing 29 C.F.R. § 825.220). Plaintiff's claim invokes the theory of

retaliation.

Pursuant to 29 U.S.C. § 2615(a)(2), an employer may not discriminate or retaliate against an

employee for taking FMLA leave. Thus, employers are prohibited from "us[ing] the taking of

FMLA leave as a negative factor in employment actions." *Hunter*, 579 F.3d at 690 (citing 29

C.F.R. § 825.220). A Plaintiff may demonstrate a *prima facie* case by showing: (1) he invoked a

protected right under the FMLA, (2) he suffered an adverse employment action, and (3) there was

a causal connection between the two. *Wallner,* 590 Fed. App'x at 551. *See also* Seeger, 681 F.3d

at 283.

Here, as Defendants correctly point out, there is no evidence in the record suggesting that

Plaintiff took FMLA leave. 29 C.F.R. § 825.301 governs the necessary steps for designating

FMLA leave, and it states that:

> [a]n employee giving notice of the need for FMLA leave does not need to expressly
>
> assert rights under the Act or even mention the FMLA to meet his or her obligation
>
> to provide notice, though the employee would need to state a qualifying reason for
>
> the needed leave and otherwise satisfy the notice requirements set forth in §
>
> 825.302 or § 825.303 depending on whether the need for leave is foreseeable or
>
> unforeseeable.

29 C.F.R. § 825.302 requires an employee to "provide the employer at least 30 days advance notice

before FMLA leave is to begin if the need for the leave is foreseeable based on . . . planned medical

treatment for a serious injury or illness of a covered servicemember."

Plaintiff's need for FMLA leave was foreseeable since his foot injury ailed him for several years prior to the surgery. (Pl.'s Dep. 34-35). That being said, Plaintiff requested sick leave on August 22, 2016, and he started his sick leave two days later on August 24, 2016. (Pl.'s Dep. at 44-45 & 50; ECF No. 29-3, Def. Hampton Dep. Ex. 3). Accordingly, Plaintiff could not have provided the notice necessary to acquire FMLA leave. 29 C.F.R. § 825.302. Consequently, a reasonably juror could not find that there is genuine dispute of material fact as to whether Defendants retaliated against Plaintiff for taking FMLA leave.

Therefore, summary judgement in Defendants' favor is appropriate on Plaintiff's FMLA Retaliation claim.

## C. Retaliation Under the ADA

Plaintiff also asserts retaliation claims under the ADA. The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a change, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. §12203(a). "The ADA is not, however, a catchall statute creating a cause of action for any workplace retaliation, but protects individuals only from retaliation for engaging in, or aiding another who engages in, activity covered by the ADA." *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014).

In the absence of direct evidence of retaliation, an ADA retaliation claim is analyzed using the *McDonnell-Douglas* burden-shifting framework. *Id.* (citing *A.C. v. Shelby County Board of Education*, 711 F.3d 687, 697 (6th Cir. 2013)). The plaintiff bears the initial burden of establishing a *prima facie* case of retaliation, which requires a showing that: "(1) the plaintiff engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took

an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action." *Id.* If the plaintiff meets this burden, the defendant must then articulate a legitimate, non-discriminatory reason for the adverse employment action. *Penny v. UPS*, 128 F.3d 408, 417 (6th Cir. 1997). The burden then shifts back to the plaintiff to show that the proffered reason for the action was "merely pretext." *Id.*

Defendants argue that Plaintiff's retaliation claim must fail for three reasons. (ECF No. 23 at 20-22). First, Defendants aver that Plaintiff cannot establish a *prima facia* case of retaliation because he was not terminated for filing complaints with the EEOC. (*Id.* at 21). Second, Defendants maintain that Plaintiff cannot overcome the *McDonnell Douglas* burden shifting framework because they have offered a legitimate non-discriminatory reason for Plaintiff's termination. (ECF No. 23 at 20). Third, Defendants argue that Plaintiff cannot point to any evidence demonstrating that the reason given for his termination was pretextual. (ECF No. 23 at 21).

Plaintiff maintains that Defendants have missed the mark. Specifically, Plaintiff argues that he can establish a *prima facie* case of retaliation by demonstrating the causal connection between the protected activity he engaged in and his subsequent termination. (ECF No. 31 at 22). Further, Plaintiff contends that Defendants' purported reasons for his termination are pretextual because they are not based in fact. (ECF No. 31 at 25).

### 1. *Prima Facie* Case of Retaliation

The plaintiff bears the initial burden of establishing a *prima facie* case of retaliation, which requires a showing that: "(1) the plaintiff engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4)

there was a causal connection between the protected activity and the adverse action." *City of Stow*, 743 F.3d at 1046.

The parties do not dispute the first three elements of the *prima facie* case, only the fourth—whether there was a causal connection between filing the Discrimination Charges and Plaintiff's termination. To satisfy the fourth prong of a *prima facie* case, Plaintiff "must produce sufficient evidence to establish that [she] only suffered adverse employment action because of the" protected activity. *Harris v. State of Ohio, Dept. of Mental Health*, 2:01-CV-725, 2002 WL 31951262, at \*7 (S.D. Ohio Nov. 21, 2002) (citing *Nguyen v. City of Cleveland*, 229 F.3d 559 (6th Cir. 2000)). "That is, Plaintiff must establish that nothing he did, such as poor performance or attitude, precipitated the adverse employment action." *Id.* (citing *Samadi v. State of Ohio, Bureau of Employment Services*, No. C2-99-563, 2001 WL 175265, at \*8 (S.D. Ohio Feb. 13, 2001)).

Temporal proximity between the protected activity and the adverse employment action is sometimes, but not always, sufficient to demonstrate causation. In *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525–526 (6th Cir. 2008), the Sixth Circuit "found that temporal proximity demonstrated causation when the employer fired the employee the same day that the employer learned of the employee's EEOC charge." In other words, "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation." *Goree v. United Parcel Serv., Inc.*, 17-5139, 2017 WL 5664924, at \*4 (6th Cir. Nov. 8, 2017) (citing *Mickey*, 516 F.3d at 525).

"But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.* (citing *Little v. BP Expl. &*

*Oil Co.*, 265 F.3d 357, 365 (6th Cir. 2001)). Thus, "unless immediate, temporal proximity must be 'coupled with other indicia of retaliatory conduct' to give rise to a causal inference." *McCoy v. Mv Residential Prop. Mgt., Inc.*, 2:14-CV-2642, 2016 WL 1392483, at *7 (S.D. Ohio Apr. 8, 2016) (citing *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588-89, 595 (6th Cir. 2009)).

In *Merendo v. Ohio Gastroenterology Grp., Inc.*, the plaintiff was required to show other evidence of retaliatory conduct even though the employer learned that she had engaged in protected activity nine days before her termination. *Merendo v. Ohio Gastroenterology Grp., Inc.*, No. 2:17-cv-817, 2019 U.S. Dist. LEXIS 31507, at *58 (S.D. Ohio 2019). Here, Plaintiff filed the Discrimination Charges with the EEOC and OCRC on February 14, 2017. (*See generally* ECF No. 29-5, Def. Hampton Dep. Ex. 5). Approximately three months later, on May 9, 2017, Defendant MCS sent a letter to Plaintiff officially notifying him of his termination. (ECF No. 29-15, Def. Hampton Dep. Ex. 22). Thus, the period of time between the protected activity and the adverse employment action is too protracted to find retaliation based on temporal proximity alone. Plaintiff must show other evidence of retaliatory conduct to prevail on his ADA retaliation claim. *McCoy v. Mv Residential Prop. Mgt., Inc.*, 2016 WL 1392483, at *7.

Plaintiff's other evidence of retaliatory conduct is predicated on the fact that Defendants reopened their investigation into Plaintiff's sick leave because he filed the Discrimination Charges. (ECF No. 31 at 23). As explained *supra*, Defendants properly reopened their investigation into Plaintiff's sick leave to respond to the various allegations that Plaintiff had made in the Discrimination Charges, not as a response to the filing of the Discrimination Charges generally.

Considering the above, Plaintiff has failed to establish a causal connection between his termination and the Discrimination Charges. Thus, a reasonable juror could not find that Plaintiff

has established a *prima facie* case of retaliation. Accordingly, Defendants are entitled to summary judgment on Plaintiff's ADA retaliation claims.

## D. Intentional Infliction of Emotional Distress

Plaintiff also brings a claim for intentional infliction of emotional distress against Defendants. (ECF No. 1 at 12). In Ohio, a claim for intentional infliction of emotional distress requires a showing of the following: "(1) that the defendant intended to cause the plaintiff's serious emotional distress, (2) that the defendant's conduct was extreme and outrageous, and (3) that the defendant's conduct was the proximate cause of plaintiff's serious emotional distress." *Gore v. AT&T*, Case No. 2:09-cv-854, 2010 U.S. Dist. LEXIS 79398, at *7 (S.D. Ohio 2010) (citing *Phung v. Waste Management, Inc.*, 71 Ohio St.3d 408, 410 (1998)).

In his Complaint, Plaintiff makes several allegations in furtherance of his intentional infliction of emotional distress claim such as: (i) Defendants targeted, harassed, and ultimately discharged Plaintiff based on his disability and his filing of the charges; (ii) Defendants intended to cause Plaintiff emotional distress, or knew that their acts or omissions would result in serious emotional distress to Plaintiff; (iii) Defendants' conduct was so extreme and outrageous as to go beyond all possible bounds of decency; (iv) Defendants proximately caused Plaintiff mental anguish, including severe depression and anxiety, of such a serious nature that no reasonable person could be expected to endure it; and (v) Defendants proximately caused Plaintiff to suffer damages, including economic, emotional distress and physical sickness damages. (ECF No. 1 at 12). But Defendants moved for summary judgment on Plaintiff's claim arguing that there is no evidence that their conduct was outrageous. (ECF No. 23 at 22). Plaintiff did not respond to Defendants' argument in his Response in Opposition. (*See generally* ECF No. 31).

As Defendants correctly point out, "[c]onduct giving rise to an IIED claim must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Long v. Ford Motor Co.*, 193 F. App'x 497, 503 (6th Cir. 2006) (citing *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 453 N.E.2d 666, 671 (Ohio 1983) (*overruled on other grounds*)). Further, "to say that Ohio courts narrowly define 'extreme and outrageous' conduct would be something of an understatement." *Baab v. AMR Servs. Corp.*, 811 F. Supp. 1246, 1269 (N.D. Ohio 1993). An employee's termination, "even if based upon discrimination, does not rise to the level of 'extreme and outrageous' conduct without proof of something more. If such were not true, then every discrimination claim would simultaneously become a cause of action for the intentional infliction of emotional distress." *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 376 (6th Cir. 1999).

In support of his claim, Plaintiff does not argue any additional facts beyond those alleged in his Complaint. (*Compare* ECF No. 1 *with* ECF No. 31). Specifically, Plaintiff alleges that "Defendants targeted, harassed, and ultimately discharged Plaintiff based on his disability and his filing of the Charges." (ECF No. 1 at 12). Plaintiff's allegations indicate that the alleged extreme and outrageous conduct includes his termination as well as the line of events that led to his termination. That being said, even when an employee's termination is based on discrimination, such an act does not rise to the level of extreme and outrageous conduct without proof of something more. *Godfredson v. Hess & Clark, Inc.*, 173 F.3d at 376.

The record discloses that Defendants met with Plaintiff to discuss his sick leave on three separate occasions. (Pl.'s Dep. at 91-92; Def. Hampton Dep. at 109-110; ECF No. 29-8, Def. Hampton Dep. Ex. 10 at 2 & 4). The first two occurred in November of 2016, and the third occurred

34

just prior to Plaintiff's termination on April 27, 2016. (*Id.*). Defendants called these meetings to question Plaintiff about his sick leave. (*Id.*). Defendants also reached out to the Belpre PD and Shelly and Sands, Inc. on three separate occasions to gather details on Plaintiff's work with both entities. (Def. Hampton Dep. at 55-57; ECF No. 29-20, Def. Prim Dep. Ex. B at 2; ECF No. 29-8, Def. Hampton Dep. Ex. 10 at 3). These facts alone are insufficient to come within Ohio's narrow definition of extreme and outrageous conduct. *Baab*, 811 F. Supp. at 1269. Defendants filed a police report accusing Plaintiff of theft but such an act falls outside the definition of outrageous conduct as well. (ECF No. 29-17, Def. Hampton Dep. Ex. 25 at 3-4); *Lively v. Donald Dunning, D.D.S., Inc.*, 2013-Ohio-1350, *28 (Ohio Ct. App. 2013) (noting that the initiation of a police report and cooperation in a police investigation is not considered the type of outrageous conduct that would support an intentional infliction of emotional distress claim). Finally, Plaintiff reported to Defendant Hampton that he had been followed by two Defendant MCS employees, but the record does not establish that he was followed at Defendants' request. (ECF No. 29-16, Def. Hampton Dep. Ex. 24; Def. Prim Dep. at 40-41). Further, when Plaintiff reported his concern about being followed, Defendant Prim confronted the two employees who followed Plaintiff and instructed them to stop. (*Id.*).

Considering the above, a reasonable juror could not return a verdict in Plaintiff's favor on his intentional inflictions of emotional distress claim. Accordingly, summary judgement in Defendants' favor is appropriate on Plaintiff's intentional infliction of emotional distress claim.

## IV.

For the reasons stated above, this Court **GRANTS** Defendants' joint Motion for Summary Judgment. (ECF No. 23). Plaintiff's claims are dismissed, and the Clerk is **DIRECTED** to enter judgement in favor of Defendants.

**IT IS SO ORDERED.**

_1-31-2020_
**DATE**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**